SDD:SPN/TAD/MEB
F.# 2015R000079

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN THE MATTER OF AN APPLICATION FOR A
SEARCH WARRANT FOR THE PREMISES
KNOWN AND DESCRIBED AS FACEBOOK
USERNAME AND/OR USER IDENTIFICATION:

ID: 100007691957706

**15 M 1238**

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR A SEARCH
WARRANT

(T. 18, U.S.C. § 2339B)

EASTERN DISTRICT OF NEW YORK, SS:

      JOHN RADZICKI, being duly sworn, deposes and says that he is a Special

Agent with the Federal Bureau of Investigation ("FBI") assigned to the FBI's Joint Terrorism

Task Force ("JTTF"), duly appointed according to law and acting as such.

      Upon information and belief, there is probable cause to believe that there is

located in THE PREMISES KNOWN AND DESCRIBED AS FACEBOOK USERNAME

AND/OR USER IDENTIFICATION NUMBER: ID: 100007691957706 ("the FACEBOOK

PREMISES"), information, as described more fully in Attachment B, constituting evidence,

fruits, and instrumentalities of, among other crimes, attempting to provide material support

and resources, including personnel, including the defendant, TAIROD PUGH, to a foreign

terrorist organization, to wit: the Islamic State of Iraq and the Levant ("ISIL"), in violation

of Title 18, United States Code, Section 2339B(a).

      (Title 18, United States Code, Sections 2339B).

1

The source of your deponent's information and the grounds for his belief are as follows:[1]

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a Facebook user name that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The FACEBOOK PREMISES to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in their possession pertaining to the subscriber(s) or customer(s) associated with the FACEBOOK PREMISES.

2.      I have been a Special Agent with the FBI since 2010 and have been assigned to the New York JTTF since February 2015. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for committing acts of terrorism. As a Special Agent, I have investigated national security matters, and I have conducted physical surveillance, executed court-authorized search warrants, and used other investigative techniques to secure relevant information. As a result

---

[1]      Because this affidavit is submitted for the limited purpose of establishing probable cause for a search warrant, I have not set forth each and every fact learned during the course of the investigation.

2

of my training and experience, I am familiar with the tactics, methods, and techniques of

terrorist networks and their members, including the use of computers, cellular telephones,

social media, email, and the internet in connection with their criminal activity. I am

currently assigned to JTTF squad CT-3, and my responsibilities include the extra-territorial

investigation of terrorist activity in Africa and elsewhere, including terrorist activity by

various designated foreign terrorist organizations.

3.     I have personally participated in the investigation of the offenses

discussed below. I am familiar with the facts and circumstances of the investigation from:

(a) my personal participation in this investigation; (b) interviews with witnesses; (c) my

review of records and reports generated by other law enforcement agents in the United States

and elsewhere; (d) my review of documents and communications recovered during the

investigation; and (e) information provided to me by other agents and law enforcement

officials.

## FACTUAL BACKGROUND

### A.    ISIL

4.     United States law enforcement agents, including members of the New

York JTTF, have been investigating individuals located in the United States and abroad who

may have traveled to Syria to fight violent jihad and provide material support to designated

foreign terrorist organizations, including ISIL, that are operating in that country.

5.     On October 15, 2004, the United States Secretary of State designated

al-Qa'ida in Iraq, then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist

Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a

Specially Designated Global Terrorist Entity under section 1(b) of Executive Order 13224.

On May 15, 2014, the Secretary of State amended the designation of al-Qa'ida in Iraq as a

FTO under Section 219 of the Immigration and Nationality Act and as a Specially

Designated Global Terrorist Entity under section 1(b) of Executive Order 13224 to add the

alias ISIL as its primary name.  The Secretary also added the following aliases to the ISIL

listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria

("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-

Furqan Establishment for Media Production.  Although the group has never formally called

itself "Al-Qaeda in Iraq," this name has frequently been used to describe ISIL through its

history.  In an audio recording publicly released on June 29, 2014, ISIL announced a formal

change of its name to Islamic State ("IS").  To date, ISIL remains a designated FTO.

**B.    Background on TAIROD PUGH**

6.     PUGH, 47, is a United States citizen.  Until recently, PUGH's last

known address in the United States was in Neptune, New Jersey.  As discussed in more detail

below, PUGH was arrested on January 16, 2015 pursuant to a warrant issued by United

States Magistrate Judge Steven Locke, and was indicted by a grand jury on March 16, 2015

for counts including Attempt to Provide Material Support to an FTO, in violation of Title 18,

United States Code, Section 2339B(a)(1).

4

7.     From in or about 1986 to 1990, PUGH served in the United States Air Force, where he worked as an avionics instrument system specialist and received training in the installation and maintenance of aircraft engine, navigation, and weapons systems.

8.     PUGH most recently worked for Gryphon Airlines/FK Logistics Aviation ("Gryphon") as an airplane mechanic in Kuwait City, Kuwait.  Gryphon is a commercial charter airline based in Kuwait City.  Gryphon operates commercial charter flights to Iraq and Afghanistan as well as within these countries; it is an approved contractor to the United States military.  PUGH was fired from Gryphon in or about December 2014.

9.     Based on interviews with PUGH's family members in January 2015, investigators learned that, prior to his arrest, PUGH had been living overseas for approximately eighteen months in Egypt, Dubai and Jordan, among other locations.

C.     **PUGH's Detention in Egypt**

10.     On January 10, 2015, PUGH was stopped for questioning upon arrival at Ataturk Airport in Istanbul, Turkey, after debarking from a flight from Egypt.  When questioned by Turkish authorities, PUGH falsely claimed he was a pilot with the United States Special Forces and that he sought to enter Turkey for vacation.  PUGH refused to allow the Turkish authorities to access his laptop as part of a border crossing search.  The

5

Turkish authorities denied PUGH entry into the country and placed him on a return flight to Cairo, Egypt.[2]

11.     When he arrived in Egypt on the evening of January 10, 2015, PUGH was detained pending deportation to the United States. Upon being detained, PUGH stated that he had been unable to find work in Egypt and had traveled to Turkey to look for a job. PUGH denied any desire to travel to Syria.[3]

12.     PUGH's possessions at the time of his detention in Egypt included various electronic media devices, including an HP laptop computer, an Apple iPod, a Samsung Galaxy S4 mobile telephone, a Pixel mobile telephone, and five USB thumb drives (the "Electronic Devices"). In Egypt, PUGH's laptop was assessed to have water damage and was inoperable. PUGH's iPod appeared to have been reset or initialized, i.e., wiped clean of data. In addition, many of the USB thumb drives appeared damaged and were missing their outer casings. It thus appeared that PUGH had purposefully tampered with the Electronic Devices to prevent anyone from accessing his electronic media.

---

[2]     The information in paragraph 10 was provided by a confidential source who has provided reliable information in the past and who has firsthand knowledge of the stated facts. This confidential source has no prior relationship with PUGH and, based on my knowledge of the source, I have no reason to believe that the confidential source harbors any bias against PUGH.

[3]     The information provided in paragraphs 11 – 12 was provided by an Egyptian government official who works at Cairo International Airport.

6

13.     On January 11, 2015, FBI agents obtained PUGH's Electronic Devices. The Electronic Devices were transported to the United States, where they remain in FBI custody.

**D.     The Search of PUGH's Electronic Devices**

14.     On January 14, 2015, United States Magistrate Judge James Orenstein issued a search warrant permitting the FBI to search the Electronic Devices (the "1/14/15 Warrant").

15.     A search of the Electronic Devices pursuant to the 1/14/15 Warrant revealed that the internal memory chips had been removed from four of the five damaged thumb drives, and thus no examination of the contents of those devices could be completed.

16.     A search of PUGH's laptop revealed an email dated December 11, 2014, sent from tairod.pugh@outlook.com, in which PUGH informed an acquaintance that he had been fired from his job.

17.     Agents also discovered on PUGH's laptop well over 100 terrorist propaganda videos, including an ISIL video that shows the execution of multiple prisoners. This video shows the prisoners being captured, lined up, and shot in the head, one by one. Information obtained from PUGH's laptop indicates that this video was downloaded on December 18, 2014.  Other propaganda videos were downloaded between September 22, 2014 and December 18, 2014.

18.     A review of PUGH's laptop also revealed that on or about October 13, 2014, a registered user of the laptop associated with the name "Tairod" logged onto

Facebook and visited the video link: "video shows Islamic state recruits with US equipment at training in Iraq." On October 15, 2014, "Tairod" logged into Facebook and visited an internet link containing the following: "the beginning of the end – why the west can never beat ISIS."[4]

19.     In addition, PUGH's laptop contained a chart of crossing points between Turkey and Syria, which was downloaded on January 5, 2015. The chart, dated December 12, 2014, shows specific places where one may cross the border between Turkey to Syria, information about whether the checkpoints are manned by Turkish authorities, and the particular group(s) who control the inner areas of the border within Syria. ISIL appears on the chart as an "inner border actor," i.e., a group controlling inner areas of Syria, in multiple places on the chart.

20.     Based on my training and experience, I know that the Turkish border with Syria is the primary entry point for foreign fighters seeking to travel into and out of Syria to wage violent jihad on behalf of designated foreign terrorist organizations such as ISIL.

### E.     PUGH and the UC's Facebook Accounts

21.     PUGH arrived in the United States on January 15, 2015, after being deported from Egypt. Upon arrival in the United States, PUGH was detained by U.S.

---

[4]     ISIL and ISIS are used interchangeably and refer to the same terrorist organization.

Customs and Border Protection ("CBP") for secondary inspection and for an interview by Department of State concerning his deportation from Egypt.

22. While waiting to be interviewed, PUGH began speaking to an individual who, unbeknownst to PUGH, was an undercover agent ("UC") from the FBI. The UC and PUGH spoke for more than one hour. They agreed to meet at a Dunkin' Donuts at JFK Airport. During their conversation at the Dunkin' Donuts, PUGH explained, in sum and substance, that he had been denied entry into Turkey because Turkish authorities did not like the way PUGH looked. During the same conversation, the UC asked PUGH if PUGH used Facebook, and PUGH responded that he did. The UC then opened his/her Facebook page, the FACEBOOK PREMISES, on his/her smart phone. The FACEBOOK PREMISES included the ISIL flag as its banner. PUGH looked at the FACEBOOK PREMISES, including the ISIL flag banner, and appeared pleased. PUGH then gave the UC his Facebook name. PUGH asked the UC to look up PUGH's Facebook page (the "Pugh Facebook Account"), which the UC did. The UC and PUGH agreed to correspond via Facebook or by cellular telephone.

23. Based on interviews with close associates, investigators learned that PUGH had posted violent jihadist images on his private Facebook page, including images of executions, killings, and bombings.

24. On January 16, 2015, United States Magistrate Judge Steven I. Locke issued a warrant for PUGH's arrest based on a complaint charging PUGH with attempting to provide material support to ISIL, in violation of Title 18, United States Code, Section

9

2339B(a)(1) (the "arrest warrant"). PUGH was arrested pursuant to that arrest warrant at approximately 11 p.m. on January 16, 2015.

25. Based in part on the foregoing information, on February 17, 2015, the Honorable Judge Steven M. Gold, Chief United States Magistrate Judge for the Eastern District of New York, issued a warrant authorizing a search of the Pugh Facebook Account (the "2/27/2015 Warrant"). The search warrant return establishes that PUGH used the Pugh Facebook Account to search for and access photos, videos, and news accounts related to ISIL and at times to communicate with others about the group.

26. On March 15, 2015, a grand jury in the Eastern District of New York returned an indictment charging PUGH with one count of Attempt to Provide Material Support to ISIL, in violation of Title 18, United States Code, Section 2339B(a)(1), and one count of Obstruction and Attempted Obstruction of an Official Proceeding, in violation of Title 18, United States Code, Section 1512.

F. **Probable Cause to Search the FACEBOOK PREMISES**

27. As described above, on January 15, 2015, PUGH viewed the ISIL flag banner displayed on the FACEBOOK PREMISES, and gave the UC PUGH's Facebook name. This fact alone establishes that the FACEBOOK PREMISES contains information relevant to Attempting to Provide Material Support to ISIL, in violation of Title 18, United States Code, Section 2339B(a)(1).

10

28.     Further, the UC has advised me that the UC established the FACEBOOK PREMISES account in or around early 2014, and only used the account to communicate and correspond with individuals, like the defendant, who were suspected of being associated with terrorist activity.

29.     The UC gave verbal consent to the FBI to execute a search of the FACEBOOK PREMISES. According to a webpage published by Facebook entitled "Information for Law Enforcement Authorities,"[5] where a law enforcement official is relying on an account user's consent, "the user should be directed to obtain that information on their own from their account." However, the UC has confirmed to me that the UC no longer has access to the FACEBOOK PREMISES, because it has been taken down by Facebook. In fact, I have learned from my investigation that Facebook took the account down shortly after January 15, 2015, because Facebook suspected the FACEBOOK PREMISES was associated with terrorist activity.

30.     Following the contact described above, FBI agents sent preservation letters to Facebook requiring preservation of the FACEBOOK PREMISES. Facebook representatives have confirmed that the FACEBOOK PREMISES has been preserved.

31.     The search warrant requested herein is necessary to obtain the evidence sought, because although the UC consents to the FBI obtaining this information, the UC has

---

[5]     Available at: https://www.facebook.com/safety/groups/law/guidelines/ (last accessed December 29, 2015).

11

no ability to obtain the information from Facebook absent a Court order. Indeed, as the Facebook webpage referenced above states, "A search warrant . . . is required to compel the disclosure of the stored contents of any account . . . ." A copy of Facebook's "Information for Law Enforcement Authorities" is attached hereto as Attachment C.

32.     Based on the foregoing information, there is probable cause to believe that the FACEBOOK PREMISES will contain evidence of crimes, specifically: attempted provision of material support to a terrorist organization, in violation of Title 18, United States Code, Section 2339B(a). In particular, I am requesting information from Facebook relating to the FACEBOOK PREMISES, as set forth in Attachment B, for the time period from January 1, 2014 until the date in 2015 that the FACEBOOK PREMISES was closed by Facebook.

## TECHNICAL BACKGROUND REGARDING THE FACEBOOK PREMISES

33.     The FACEBOOK PREMISES consists of one or more accounts, as set forth in Attachment A, hosted by Facebook, an Internet-based social networking service. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

34.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

35.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

36.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include

other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

37. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

38. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

14

39.    Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

40.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

41.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

42.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

43.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone

15

as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

44.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

45.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

46.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

47.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

48.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists,

16

including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

49.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

50.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

17

51.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

52.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

53.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that within the FACEBOOK PREMISES in the control of Facebook there exists evidence of providing material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B. Accordingly, I request that the Court issue the proposed search warrant.

54.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a),

(b)(1)(A) and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

55.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  I therefore request authorization to execute the warrants at any time, day or night.

56.     WHEREFORE, your deponent respectfully requests that the requested search warrant be issued for the FACEBOOK PREMISES.

JOHN RADZICKI
Special Agent
Federal Bureau of Investigation

Sworn before me this
30th day of December, 2015

THE HON
UNITED :                                                 DGE
EASTERN

## ATTACHMENT A
### Property to Be Searched

This warrant applies to information associated with the FACEBOOK USERNAME AND/OR USER IDENTIFICATION NUMBER: ID: 100007691957706 (hereinafter, the "FACEBOOK PREMISES"), from January 1, 2014 until the date in 2015 the FACEBOOK PREMISES was closed, that is stored at premises owned, maintained, controlled, or operated by Facebook, a company located in Menlo Park, California.

1

## ATTACHMENT B
### Particular Things to be Seized

**I.**     <u>**Information to be disclosed by Facebook**</u>

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the user ID listed in Attachment A:

- (a) All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.
- (b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities;
- (c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;
- (d) All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;
- (e) All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;
- (f) All "check ins" and other location information;
- (g) All IP logs, including all records of the IP addresses that logged into the account;
- (h) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";
- (i) All information about the Facebook pages that the account is or was a "fan" of;
- (j) All past and present lists of friends created by the account;
- (k) All records of Facebook searches performed by the account;

1

(l)    All information about the user's access and use of Facebook Marketplace;

(m)    The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

(n)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(o)    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 2339B, including, for the user ID identified on Attachment A, information pertaining to the following matters: Providing, attempting to provide, or conspiring to provide material support to a designated foreign terrorist organization, including, by way of example only:

(a) communications and photographs concerning terrorist organizations and operatives;

(b) photographs of flags and insignia for terrorist organizations;

(c) communications concerning terrorist financing, the location of terrorist groups, and/or methods of traveling to join designated foreign terrorist organizations; and

(d) records relating to who created, used, or communicated with the user ID, including records about their identities and whereabouts.

2